UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

DERRICK D. FREDERICK,

               Plaintiff,

v.

                                        Case No. 3:20-cv-1068-MMH-JBT

SGT. D. TOMPKINS,[1]

               Defendant.

_____

## ORDER

### I. Status

Plaintiff Derrick D. Frederick, an inmate in the custody of the Florida Department of Corrections (FDOC), initiated this action on September 22, 2020, by filing a pro se Complaint (Doc. 1)[2] with exhibits (Doc. 11). Frederick filed an Amended Complaint (AC; Doc. 19) on February 4, 2021. In the AC, Frederick asserts claims pursuant to 42 U.S.C. § 1983 (related to a December 13, 2019 incident at New River Correctional Institution (NRCI)) against Defendant D. Tompkins.[3]  He seeks monetary damages.

_____

[1] The proper spelling of Defendant's surname is Tompkins. See Doc. 46-1. The Court will direct the Clerk to correct the docket.

[2] In referencing documents filed in this case, the Court will cite the document page numbers as assigned by the Court's Electronic Case Filing System.

[3] The Court previously dismissed Frederick's claims against Defendant R. Johnson, a corrections officer. See Order (Doc. 40).

This matter is before the Court on Defendant Tompkins' Motion for Summary Judgment (Motion; Doc. 46). He submitted exhibits in support of the Motion. See Docs. 46-1 through 46-6; 57. The Court advised Frederick of the provisions of Federal Rule of Civil Procedure 56, notified him that the granting of a motion to dismiss or a motion for summary judgment would represent a final adjudication of this case which may foreclose subsequent litigation on the matter, and gave him an opportunity to respond to the Motion. See Order (Doc. 5); Summary Judgment Notice (Doc. 48). Frederick filed a response in opposition to the Motion. See Motion to Refute Defendant's Summary Judgment (Response; Doc. 51). As such, Defendant's Motion is ripe for review.

## II. Plaintiff's Allegations[4]

In the AC, as count one, Frederick asserts that Defendant Tompkins violated his Eighth Amendment right to be free from cruel and unusual punishment when Tompkins directed Johnson, his subordinate, to slam the quad door, which caused "a partial amputation" of Frederick's finger. AC at 2. He also asks that the Court exercise supplemental jurisdiction under 28 U.S.C. § 1367 over the state law claims that he asserts in counts two through five; specifically, civil battery (count two); civil assault (count three); negligent

---

[4] The recited facts are drawn from the AC.

2

infliction of emotional distress (count four); and personal capacity negligence (count five). Id. at 2-4.

As to the specific underlying facts supporting his claims, Frederick alleges that he was returning to G dormitory after lunch between 11:30 a.m. and 12:00 p.m. on December 13, 2019. Id. at 2. According to Frederick, he entered the sallyport area, stood at the quad-four door, and waited for the officer in the booth to open the door so he could enter. Id. He states that Tompkins and Johnson were inside the wing waiting to exit. Id. Frederick asserts that when he "grabbed the door frame," Tompkins ordered Johnson to close the door. Id. According to Frederick, Johnson "maliciously and sadistically slammed the door on the inmates, pushing them in the process, and on Mr. Frederick's finger partially amputating [it]." Id. He maintains that Tompkins and Johnson falsified their reports to "conceal" what happened. Id. He avers that officers "rushed" him to the medical clinic. Id.

### III. Summary Judgment Standard

Under Rule 56 of the Federal Rules of Civil Procedure (Rule(s)), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The record to be considered on a motion for summary judgment may include "depositions, documents,

electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).[5] An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the non-moving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)). "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

---

[5] Rule 56 was revised in 2010 "to improve the procedures for presenting and deciding summary-judgment motions." Rule 56 advisory committee's note 2010 Amends.

> The standard for granting summary judgment remains unchanged. The language of subdivision (a) continues to require that there be no genuine dispute as to any material fact and that the movant be entitled to judgment as a matter of law. The amendments will not affect continuing development of the decisional law construing and applying these phrases.

Id. "[A]lthough the interpretations in the advisory committee['s] notes are not binding, they are highly persuasive." Campbell v. Shinseki, 546 F. App'x 874, 879 n.3 (11th Cir. 2013). Thus, case law construing the former Rule 56 standard of review remains viable.

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (internal citations and quotation marks omitted). Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995) (citing Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro, 38 F.3d 1571, 1578 (11th Cir. 1994)). "Summary judgment is improper, however, if the evidence is such that a reasonable jury could return a verdict for the

5

nonmoving party." <u>Guevara v. NCL (Bahamas) Ltd.</u>, 920 F.3d 710, 720 (11th Cir. 2019) (quotation marks and citation omitted).

## IV. Summary of the Arguments

In the Motion, Defendant Tompkins maintains that the Court should grant summary judgment in his favor as to Frederick's Eighth Amendment and state law claims against him. <u>See</u> <u>generally</u> Motion. Tompkins argues that the video evidence supports his position that he did not violate Frederick's Eighth Amendment right. He also asserts that he is entitled to qualified immunity. <u>Id.</u> at 18-19. Additionally, Tompkins contends that Frederick fails to state plausible assault, battery, and negligence claims. <u>Id.</u> at 14-18. In his Response, Frederick repeats the allegations set forth in the AC, <u>see</u> Response at 1-3, and asks the Court to "set this cause of action for trial," <u>id.</u> at 3.[6]

---

[6] Frederick also asks that the Court grant summary judgment in his favor as to his claims against Defendant Tompkins. <u>See</u> Response at 3. However, a request for affirmative relief, such as the entry of summary judgment in Frederick's favor, cannot be imbedded in a response to a party's motion for summary judgment. Rather, a party is required to file a proper motion seeking the entry of such relief in accordance with the Federal Rules of Civil Procedure and the Local Rules of the United States District Court, Middle District of Florida (Local Rule(s)). <u>See</u> Fed. R. Civ. P. 7(b); Local Rule 3.01(a) (requiring, among other things, a memorandum of legal authority in support of a request from the Court). This, Frederick has not done. Thus, his request for entry of summary judgment in his favor is not properly before the Court and for this reason is due to be denied.

# V. Applicable Law

## A. Eighth Amendment Deliberate Indifference

The Eleventh Circuit has explained the requirements for an Eighth Amendment violation.

> "The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones ...." Farmer, 511 U.S. at 832, 114 S. Ct. at 1976 (internal quotation and citation omitted).[ 7 ] Thus, in its prohibition of "cruel and unusual punishments," the Eighth Amendment requires that prison officials provide humane conditions of confinement. Id. However, as noted above, only those conditions which objectively amount to an "extreme deprivation" violating contemporary standards of decency are subject to Eighth Amendment scrutiny. Hudson, 503 U.S. at 8-9, 112 S. Ct. at 1000.[8] Furthermore, it is only a prison official's subjective deliberate indifference to the substantial risk of serious harm caused by such conditions that gives rise to an Eighth Amendment violation. Farmer, 511 U.S. at 828, 114 S. Ct. at 1974 (quotation and citation omitted); Wilson, 501 U.S. at 303, 111 S. Ct. at 2327.[9]

Thomas v. Bryant, 614 F.3d 1288, 1306-07 (11th Cir. 2010). The Eighth Amendment also requires prison officials to "take reasonable measures to guarantee the safety of the inmates." Farmer, 511 U.S. 832 (quoting Hudson v. Palmer, 468 U.S. 517, 526-27 (1984)); Cox v. Nobles, 15 F.4th 1350, 1357

---

[7] Farmer v. Brennan, 511 U.S. 825 (1994).
[8] Hudson v. McMillian, 503 U.S. 1 (1992).
[9] Wilson v. Seiter, 501 U.S. 294 (1991).

7

(11th Cir. 2021). However, not every injury that a prisoner suffers as a result of a prison condition necessarily equates to a constitutional violation. <u>See</u> <u>Goodman v. Kimbrough</u>, 718 F.3d 1325, 1333 (11th Cir. 2013). Only injuries that occur as a result of a prison official's deliberate indifference rise to the level of an Eighth Amendment violation. <u>See</u> <u>Farmer</u>, 511 U.S. at 834.

The Eleventh Circuit has explained the requirement of deliberate indifference to a substantial risk of harm as follows:

> To establish a § 1983 claim for deliberate indifference, a plaintiff must show "(1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation."[10]
>
> **The first element** of deliberate indifference — whether there was a substantial risk of serious harm — is assessed objectively and requires the plaintiff to show "conditions that were extreme and posed an unreasonable risk of serious injury to his future health or safety."[11] **The second element** — whether the defendant was deliberately indifferent to that risk — has both a subjective and an objective component. Subjectively, the "official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and ... also draw the inference."[12] Objectively, the official must have responded to the known risk in an unreasonable manner, in that he or she "knew of ways to reduce the harm" but knowingly or recklessly declined to act.[13]

---

[10] <u>Lane v. Philbin</u>, 835 F.3d 1302, 1307 (11th Cir. 2016) (quoting <u>Hale v. Tallapoosa Cnty.</u>, 50 F.3d 1579, 1582 (11th Cir. 1995)).

[11] <u>Lane</u>, 835 F.3d at 1307.

[12] <u>Rodriguez v. Sec'y for Dep't of Corr.</u>, 508 F.3d 611, 617 (11th Cir. 2007) (quoting <u>Farmer</u>, 511 U.S. at 837).

[13] <u>Rodriguez</u>, 508 F.3d at 620 (quoting <u>Hale</u>, 50 F.3d 1583).

8

> **Finally**, the plaintiff must show a "necessary causal link" between the officer's failure to act reasonably and the plaintiff's injury.[14]

Marbury v. Warden, 936 F.3d 1227, 1233 (11th Cir. 2019) (per curiam) (emphasis added); Johnson v. Bessemer, Ala., City of, 741 F. App'x 694, 698-99 (11th Cir. 2018) (per curiam).[15]

The Eleventh Circuit has explained:

> Proof of deliberate indifference requires a great deal more than does proof of negligence: "To be deliberately indifferent a prison official must know of and disregard 'an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" Purcell, 400 F.3d at 1319-20 (emphasis supplied) (quoting Farmer v. Brennan, 511 U.S. 825, 837, 114 S. Ct. 1970, 1979, 128 L.Ed.2d 811 (1994)).[16]

> **In other words, a plaintiff in [Frederick]'s position must show not only that there was a substantial risk of serious harm, but also that [Defendant] "subjectively knew of the substantial risk of serious harm and that [he] knowingly or recklessly disregarded that risk."** Hale, 50 F.3d at 1583 (alteration omitted) (internal quotation marks omitted). Whether prison officials had the requisite awareness of the risk "is a question

---

[14] Rodriguez, 508 F.3d at 622-23.

[15] The Court does not rely on unpublished opinions as binding precedent; however, they may be cited in this Order when the Court finds them persuasive on a particular point. See McNamara v. GEICO, 30 F.4th 1055, 1060-61 (11th Cir. 2022); see generally Fed. R. App. P. 32.1; 11th Cir. R. 36–2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

[16] Purcell ex rel. Estate of Morgan v. Toombs Cnty., Ga., 400 F.3d 1313 (11th Cir. 2005).

of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." <u>Farmer</u>, 511 U.S. at 842, 114 S. Ct. at 1981 (citation omitted). At the same time, the deliberate indifference standard – and the subjective awareness required by it – is far more onerous than normal tort based standards of conduct sounding in negligence: "Merely negligent failure to protect an inmate from attack does not justify liability under [§] 1983." <u>Brown v. Hughes</u>, 894 F.2d 1533, 1537 (11th Cir. 1990) (per curiam). **And[,] needless to say, to defeat a motion for summary judgment, [a plaintiff] must adduce specific evidence from which a jury could reasonably find in his favor; "[t]he mere existence of a scintilla of evidence in support of [his] position will be insufficient."** <u>Anderson</u>, 477 U.S. at 252, 106 S. Ct. at 2512.

<u>Goodman</u>, 718 F.3d at 1332 (emphasis added and deleted); <u>Cox</u>, 15 F.4th at 1358; <u>Mosley v. Zachery</u>, 966 F.3d 1265, 1270-71 (11th Cir. 2020); <u>Scott v. Miami Dade Cnty.</u>, 657 F. App'x 877, 883 (11th Cir. 2016) (stating that "a plaintiff must allege facts that would allow a jury to conclude that: the defendant actually knew that the plaintiff faced a substantial risk of serious harm" (subjective component), and "the defendant disregarded that known risk by failing to respond to it in an objectively reasonable manner" (objective component)).

## B. Supervisory Liability

As to supervisory liability, the Eleventh Circuit has stated:

> Supervisory officials are not vicariously liable under section 1983 for the unconstitutional acts of their subordinates. Hartley v. Parnell, 193 F.3d 1263, 1269 (11th Cir. 1999). Plaintiff[] must instead allege that the supervisor, through his own actions, violated the Constitution. Ashcroft v. Iqbal, 556 U.S. 662, 676, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

Ingram v. Kubik, 30 F.4th 1241, 1254 (11th Cir. 2022). A prisoner must assert facts showing either that a supervisor personally participated in the alleged constitutional violation or that there is a causal connection between the actions of the supervising official and the alleged constitutional deprivation to state a claim against a supervising official. Hartley v. Parnell, 193 F.3d 1263, 1269 (11th Cir. 1999); Gaffney v. Warden, Taylor Corr. Inst., No. 20-13572, 2022 WL 18381, at *5 (11th Cir. Jan. 3, 2022) (per curiam) (stating supervisory liability "only occurs when the supervisor personally participates in the alleged unconstitutional conduct or when there is a causal connection between the actions of a supervising official and the alleged constitutional deprivation.").

11

## VI. Analysis[17]

## A. Eighth Amendment Claim

Frederick contends that Defendant Tompkins violated his Eighth Amendment right to be free from cruel and unusual punishment. According to Frederick, Tompkins (a supervisor) directed Johnson to close the quad door, and when Johnson slammed the door shut, one-fourth of Frederick's right middle finger was caught in the door frame and severed. Tompkins contends that he is entitled to summary judgment as to Frederick's Eighth Amendment claim against him. In support of his position, Defendant submitted exhibits, including his own Declaration (Tompkins Decl.), Doc. 46-1; an Incident Report, Doc. 46-2; Frederick's grievances and appeals, Doc. 46-4; the Declaration of Betty Renfroe, Doc. 46-6; and the Deposition of Derrick Frederick (P. Depo.), Doc. 57. With the Court's permission, <u>see</u> Order (Doc. 49), Defendant also submitted a digital video disc under seal, <u>see</u> fixed wing (FW) video, Docs. 46-3; 60 (sealed).

In his Declaration, Defendant Tompkins states in pertinent part:

> I was employed by the Florida Department of Corrections ("FDC"). On December 13, 2019, I was

---

[17] For purposes of summary judgment, the Court views the evidence and all reasonable inferences therefrom in the light most favorable to Frederick. Thus, the facts described in the Court's analysis may differ from those that ultimately can be proved.

> assigned to G dorm in New River Correctional Institution in Raiford, Florida[,] as a Sergeant.
>
> At the request of the Florida Office of the Attorney General, I have reviewed the Complaint and reports from the incident involving Inmate Derrick Frederick on December 13, 2019. The allegations as alleged by Inmate Frederick are not true. The facts are as follows:
>
> On December 13, 2019, while in G-dorm, I was not present at the door where the incident occurred. A review of the video will show that someone pulled the door open and just as soon as the door was pulled open[,] Officer Johnson[] pulled the door shut.

Tompkins Decl. at 1 (enumeration omitted). In an Incident Report, Lieutenant M. Nestved reported what he saw that afternoon. He stated in pertinent part:

> At approximately 1235 hours on December 13, 2019, while assigned as the G-dorm Housing Lieutenant[,] I was present in G-Dorm and witnessed Inmate FREDERICK, Derrick DC #122803 housed in G4101L get his right middle finger shut in the Quad 4 door. Inmate FREDERICK was escorted to medical where it was determined that he be transported to an outside medical facility for further treatment.

Doc. 46-2 at 1.

To defeat the Motion, Frederick is required to present evidence to show that there is a genuine issue for trial. In opposing Defendant's Motion, Frederick submitted his medical records and a variety of his grievances and appeals and the FDOC's responses, many pertaining to alleged improper

13

medical care. Doc. 11. In one grievance, Frederick provided the details surrounding the incident. He stated in pertinent part:

> On 12/13/19 at approximately 1130 AM to 1230 PM an incident occurred where C/O Johnson acted with []reckless disregard for my safety and well being while I was attempting to open and enter the door to quad 4 of G-dorm. When he slammed the door shut and severed 1/4 of my middle finger completely off. C/O Johnson was waiting at quad 4 dorm door, inside waiting to come out, at no time did C/O Johnson motion or verbally tell me to back up or to the other inmates to back away from the door. C/O Johnson was visi[]bly upset at the C/O in the booth for letting the inmates outside in before letting him out of the quad 4. His actions with []reckless disregard to inmates has cost me grav[e] injury in the damage done to my right middle finger. . . .

Docs. 11-9 (selected capitalization omitted); 46-4 at 3.

Frederick also submitted the notarized affidavit of inmate Quentin Bradley, FDOC #C00374, who says he saw the incident. Doc. 51-1 (Bradley Aff.). Bradley avers in pertinent part:

> I was standing right there by the wing door on camera[.] You will be able to see me on 12-13-19 at approximately 11:30 AM to 12:30 PM. I was in G-dorm wing 4 where I live[.] [W]hile I was in the dorm I saw all the other inmates returning from lunch chow. I saw inmate Derrick Frederick #122803 standing at the dorm door waiting to come in as the door open[ed.] Inmate Derrick Frederick #122803 was opening the door to allow Sgt. Thompkins and Officer Johnson to exit the wing[.] [W]hen **I heard Sgt. Thompkins scream at Officer Johnson telling him to close the fu[--]ing door[,]** Officer Johnson then forcefully

14

slammed the door close[d] and it cut off Inmate Frederick['s] finger. And since that time Inmate Frederick has not been acting like himself[,] he acts like he is depressed[,] he hasn't been the same since. [H]e's not himself. . . .

Bradley Aff. at 1 (emphasis added).

Frederick filed a Motion to Submit Declarations of Witnesses (Doc. 58) and attached the unsigned and unnotarized affidavits of two inmates who allegedly were among the inmates with Frederick in the sallyport. Affidavit of Anthony Johnson, FDOC #E38917, Doc. 58-2 at 1-2; Affidavit of Tommy Poindexter, FDOC #B07828, id. at 3-4. In the Motion, Frederick asks that the Court accept the affidavits "as notarized" because Johnson and Poindexter were not able to get the affidavits notarized due to a lockdown at South Bay Correctional Institution. Motion at 1. Defendant opposes the Motion. See Notice to Court (Notice; Doc. 61). He maintains that neither inmate is housed with Frederick at South Bay Correctional Institution,[18] see Notice at 1-2, and there is "no way for [Frederick] to prove that the testimony came from anyone other than [Frederick]," id. at 2. Defendant argues that Frederick "asks the Court to accept the affidavits under false pretenses." Id.

---

[18] Defendant attaches exhibits, showing that Johnson was released from FDOC custody on March 2, 2022, and Poindexter has been housed at Graceville Correctional Institution since September 16, 2021. Docs. 61-1; 61-2.

The Court agrees that neither Johnson nor Poindexter is housed with Frederick at South Bay Correctional Institution. Additionally, Frederick's assertions related to their inability to get affidavits notarized is seemingly less than candid. Notably, Frederick has had ample time to submit signed and notarized affidavits from Johnson and Poindexter.[19] And, regardless of the penal lockdown experienced by Frederick, he was able to obtain and submit a signed, notarized affidavit by Bradley, who is housed at South Bay Correctional Institution with Frederick. As such, Frederick's request that the Court consider Johnson's and Poindexter's unsigned and unnotarized affidavits is due to be denied, especially when Frederick had plenty of time to compile his exhibits and relies on Bradley's account of what transpired that afternoon.[20]

The parties agree that the fixed wing video (no audio) evidence captures the December 13, 2019 incident. Each generally cites to the fixed wing video footage and argues that the video evidence supports his own factual accounts as to how the events unfolded. See Motion at 3, 8, 11-14; Docs. 9; 11-9; P. Depo.

---

[19] Frederick initially listed Johnson and Poindexter as witnesses on January 11, 2021. Doc. 9 at 1. Over a year later, the Court gave Frederick a deadline (April 29, 2022) to "submit the declarations of the two inmates (Anthony Johnson and Tommy Poindexter) that [Frederick] lists in his Index of Exhibits (Doc. 9) as exhibit S, if he elects to do so." Order (Doc. 56), filed April 13, 2022.

[20] The Court notes that Bradley, who allegedly was present in G dormitory, provided a factual account that is similar to Johnson's and Poindexter's versions of how the incident unfolded.

at 19 ("The camera will show you everything."), 20-21, 24-25, 27, 46, 57. Notably, the fixed wing camera angle pointed directly towards the entry/exit door. See FW video. The first minute of the video is uneventful, showing Officer Johnson as he waited at the door while several inmates gathered and waited to enter the dormitory. Id. The video captures Frederick, as he leaned against the plexiglass window to the left of the door and stood among other inmates in the sallyport. Id. The video shows that Johnson pushed the door open, id. at 12:16:52, and then instantaneously pulled the door shut, id. at 12:16:54. Next, the video displays Frederick as he backed away from the door, cradled his hand, and walked away from the scene through the inmate crowd. Id.

Despite Frederick and Bradley's contention to the contrary, the video evidence establishes that Tompkins was not present at the doorway when Johnson opened and closed the door. Id. Because the video surveillance camera pointed directly towards the door, the area where Tompkins was present is off camera. Id. Nevertheless, within seconds of the incident, Tompkins is seen walking down the dormitory staircase and directly towards the door. Id. at 12:17:01. The video displays that when Johnson opened the door again, several inmates pointed and peered at the site where the severed portion of Frederick's finger was embedded, as they paraded through the doorway. Id. The video also shows an inmate using a cell phone, presumably to capture an image, as he

17

walked past the door jam. Id. The video evidence reflects that Tompkins and Johnson kept the door ajar and waited for the arrival of another officer, who retrieved the severed portion of Frederick's finger from the door jam. Id.

In his deposition, Frederick explained what transpired that afternoon:

> We [were] coming in from lunch, and the officer in the booth has to buzz us in. So[,] when the officer in the booth buzzed the door, I'm opening the door to let Officer Johnson and them out. When [Johnson] got the orders, he slammed the door forcefully on my finger and chopped my finger off and left it in the door, and the lieutenant got my finger out [of] the door and put it in the glove, and I was on my way to the emergency room.
>
> My finger -- one-fourth of my finger is gone. It's really ugly. It's an ugly nail growing on there, and it's not my fault because it's a -- it's a -- it's a certain way that you secure a door.
>
> . . . .
>
> For some reason, [Tompkins] went back upstairs for a minute. Before the door even opened, he was on the way back downstairs. If you look on that camera, you'll see him about over halfway downstairs from probably five feet from Johnson. So[,] he's definitely in earshot of him. He can hear him. Plus, there ain't too many people in the quad, so you can say something way from upstairs and hear downstairs. He got orders. He got orders -- direct orders from his supervisor, which is the sergeant of the dorm, to close the door. And it's not correct. Because like you say, you seen the door open, and you seen him close the door. Why would the officer buzz the door and I'm opening the door to let them out? He going to slam the door back. He got orders to slam the door from [Tompkins].

18

. . . .

[Johnson] pulled the door back, so it happened so fast. I'm looking right at him. It happened so -- if you see the camera, as soon as the door open[ed], boom, it close[d] right back. That [is] not suppose[d] to happen like that, ma'am. I'm not that fast. You need Flash to be able to move that fast. Because I'm just opening the door to be a gentleman to let the officers out the door. Let Johnson and [Tompkins] out the door.

P. Depo. at 10-11, 20-21, 23-24. Frederick blamed Tompkins and Johnson for his injury, stating that it was their "fault for not securing the door the proper way." Id. at 26. He explained:

Sergeant T[ompkins] and Johnson w[ere] at the door first waiting to come out, but the officer in the booth hadn't opened the door yet [be]cause that's the only way we can get in and they can get out. If they don't have their key, the officer in the booth have to hit the control panel to open the door. So[,] he was coming back downstairs. Johnson was still at the door. You can hear it when they open the door. It's going to buzz. So[,] the officer in the booth buzzed the door. I pulled the door to let Johnson and them come out. As soon as I pull[ed] the door, the door got slammed back and Sergeant T[]ompkins gave him authority to slam the door, which is wrong. It's not professional because care, custody, and control is a proper way to secure the door. You don't see nowhere on the video where Johnson is telling nobody to move back from the door. You didn't tell -- you didn't see him get on the walkie-talkie and tell the officer in the booth not to open the door. As they open the door, I didn't want to rush in and be disrespectful. When I see an officer at the door, so I'm going to open the door and let them out. I'm a gentleman, the courtesy. And he slammed the door. He

19

> looked right -- I looked right at him closing the door.
> Well, it happened so fast. I'm looking right at him close
> the door on my finger. It happened so fast.

Id. at 14-15. According to Frederick, they should have secured the door the way
Tompkins did after the incident when he kept the door open for the lieutenant
to retrieve the severed portion of Frederick's finger. Id. at 57.

In a conditions of confinement scenario involving an inmate, an officer's
deliberate indifference to a known, substantial risk of serious harm to an
inmate violates the Eighth Amendment. See Marbury, 936 F.3d at 1233
(emphasis added); see Goodman, 718 F.3d at 1331. To survive summary
judgment when asserting a deliberate indifference claim, a plaintiff must
produce sufficient evidence of (1) a substantial risk of serious harm (objective
component); (2) the defendant's deliberate indifference to that risk, i.e., the
defendant actually knew that the plaintiff faced a substantial risk of serious
harm (subjective component), and the defendant disregarded (by conduct that
was more than gross negligence) that known risk by failing to respond to it in
an objectively reasonable manner (objective component); and (3) causation, i.e.,
the defendant's "failure to act reasonably" caused plaintiff's injury. Goodman,
718 F.3d at 1332; Townsend v. Jefferson Cnty., 601 F.3d 1152, 1158 (11th Cir.
2010); Marbury, 936 F.3d at 1233 (stating that plaintiff's "deliberate-
indifference claim fails because he has not demonstrated a genuine factual

issue as to whether the defendants were deliberately indifferent to a substantial risk of serious harm" to him).

The fixed wing video evidence submitted by Defendant Tompkins is reliable, establishes where Tompkins, Johnson, and Frederick were situated, and provides a chronology of how the incident unfolded. Notably, Frederick acknowledges that the fixed wing video accurately recorded the event. Undoubtedly, it was a rapidly-evolving incident. What began as a routine movement of inmates from the chow hall to a housing dormitory morphed into a highly unfortunate event. The video evidence shows that Johnson opened the quad door and immediately closed the door (which caught a portion of Frederick's finger). Indeed, the video evidence unequivocally establishes the immediacy of Johnson opening and closing the door. Notably, Frederick himself testified that "it happened so fast." P. Depo. at 24.

Importantly, the crux of the matter is Tompkins' alleged directive to Johnson to close the door. Frederick and Bradley maintain they heard Tompkins' directive, and Frederick stated that Tompkins was "definitely in earshot" of Johnson. Id. at 21. At his deposition, Frederick stated that he opened the door for the officers as a gentlemanly gesture, and that Johnson slammed the door when Tompkins ordered him to close it. Id. at 24. Notably, Bradley stated that he overheard Tompkins "scream at Officer Johnson telling

21

him to close the f--king door." Bradley Decl. at 1. Frederick confirmed that inmates had told him that they heard a direct order from Tompkins to "close the door." P. Depo. at 10. He states that he heard it, but did not know it was Tompkins until later when other inmates told him. Id. at 18. Tompkins denies giving such an order. Tompkins Decl. at 1 ("The allegations as alleged by Inmate Frederick are not true."). The video evidence lacks audio, and therefore does not capture the entirety of what may have transpired. With no audio, the video itself neither confirms nor refutes Frederick's contention regarding Tompkins' verbal order, nor does it capture any post-incident discussions between Tompkins and Johnson, as they stood at the quad door to preserve the scene. Thus, for purposes of summary judgment, the Court accepts Frederick's contention that Tompkins ordered Johnson to close the door. However, as noted previously, the video does affirmatively refute Frederick's contention that Tompkins was standing beside Johnson when the door opened and closed. Indeed, the video shows that Tompkins was not standing by Johnson and that he walked down the stairs from the upper level after Frederick's finger was caught in the door, and then Tompkins stood alongside Johnson at the doorway as they preserved the scene.

The first element of Frederick's claim requires him to show that he was exposed to "conditions posing a substantial risk of serious harm." Farmer, 511

U.S. at 834. Here, no jury could conclude that closing a door where inmates are gathered on the other side awaiting entry creates an objectively substantial risk of serious harm. Frederick fails to produce any evidence showing that this prison condition was an extreme deprivation that posed an unreasonable risk of serious damage to his health or safety. See Marbury, 936 F.3d at 1233; Chandler v. Crosby, 379 F.3d 1278, 1289 (11th Cir. 2004).[21]

Closing the door knowing that an inmate's hand was partially inside the door's threshold, on the other hand, could present a substantial risk of serious harm sufficient to present a plausible Eighth Amendment claim. However, Frederick must produce evidence showing that Defendant Tompkins was deliberately indifferent to that risk, i.e., that before ordering Johnson to close the door, Tompkins knew that Frederick's finger had crossed the threshold and was in danger of being severed if the door closed. This is so because it is "[a] prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate [that] violates the Eighth Amendment." Farmer, 511 U.S. at 828 (citations omitted). Indeed, the deliberate indifference standard requires that the plaintiff demonstrate that the prison official "was subjectively aware" of

---

[21] Frederick presents no evidence in support of his conclusory belief that Defendant Tompkins' "bad history with inmates," P. Depo. at 16, 25, 31, means that Tompkins wanted to hurt him. The lack of other injurious incidents negates any suggestion that Frederick was exposed to conditions posing a substantial risk of serious harm.

the risk of harm; mere negligence is not sufficient. Id. at 829, 835-36. "The known risk of injury must be a 'strong likelihood, rather than a mere possibility' before a guard's failure to act can constitute deliberate indifference." Brown v. Hughes, 894 F. 2d 1533, 1537 (11th Cir. 1990); see also Bowen v. Warden, Baldwin State Prison, 826 F.3d 1312, 1321 (11th Cir. 2016) ("[I]t is only a heightened degree of culpability that will satisfy the subjective knowledge component of the deliberate indifference standard, a requirement that is 'far more onerous than normal tort-based standards of conduct sounding in negligence.'"). Thus, to establish an Eighth Amendment violation, an inmate must show a prison official "actually (subjectively) knows that an inmate is facing a substantial risk of serious harm, yet disregards that known risk by failing to respond to it in an (objectively) reasonable manner." Rodriguez, 508 F.3d at 617 (citing Farmer, 511 U.S. at 837, 844) (footnote omitted).

Here, despite the seriousness and truly unfortunate nature of the injury to Frederick's finger, the Court finds that Frederick fails to produce any evidence suggesting that Defendant Tompkins could actually have known Frederick faced a substantial risk of serious harm, and disregarded that known risk by failing to respond to it in an objectively reasonable manner. Preliminarily, the Court notes that Frederick himself seemingly suggests that Tompkins and Johnson were not intentionally trying to hurt him, but instead

were reckless when they failed to follow prison protocol related to securing a door, especially one with inmates nearby. See P. Depo. at 26-28. However, negligence is insufficient. Frederick must show that Tompkins deliberately disregarded a known substantial risk of serious harm. Goodman, 718 F.3d at 1332. Frederick simply points to no evidence supporting even an inference that Defendant Tompkins was aware that Frederick faced a substantial risk of serious harm as Frederick stood at the quad door among other inmates who were waiting to enter the dormitory.

Indeed, nothing in the record supports an inference that at the moment Tompkins ordered Johnson to close the door, Tompkins was aware that Frederick's finger had crossed the threshold of the door. Viewing the facts and taking all reasonable inferences in Frederick's favor, as the Court must, the video evidence establishes that Tompkins would not have been able to observe and appreciate the risk to Frederick from where Tompkins was located before he gave the verbal command to Johnson. Indeed, the parties agree that the video evidence shows the immediate succession of Johnson opening and closing the door. Frederick himself testified:

> [Johnson] pulled the door back, so it happened so fast. I'm looking right at him. It happened so -- if you see the camera, as soon as the door open[ed], boom, it close[d] right back. That [is] not suppose[d] to

> happen like that, ma'am. I'm not that fast. You need
> Flash to be able to move that fast.

P. Depo. at 23-24. The video establishes Johnson's rapid actions of opening and

closing the door were too fast to be in response to a verbal order given by

Tompkins. Moreover, even if it could have been in response to an order, the

video evidence establishes Tompkins' vantage point from which he would not

have been able to see Frederick's finger in the door when he told Johnson to

close the door. Additionally, given the speed with which Johnson opened and

closed the door, there simply was not enough time for Tompkins to observe and

appreciate a substantial danger of serious harm to Frederick's finger, and then

recklessly disregard that risk by giving the order. See Farmer, 511 U.S. at 847

(stating that "a prison official may be held liable under the Eighth Amendment

for denying humane conditions of confinement only if he knows that inmates

face a substantial risk of serious harm and disregards that risk by failing to

take reasonable measures to abate it"); Goodman, 718 F.3d at 1332; Hale, 50

F.3d at 1583.

Notably, Frederick acknowledges that when the door caught his finger,

he immediately left the scene and reported to the medical clinic, as Tompkins

(along with Johnson) was "bodyguarding that door" to retrieve the severed

portion of Frederick's finger. P. Depo. at 57. Indeed, Frederick fails to produce

any evidence showing Tompkins was deliberately indifferent to Frederick's

health and safety needs following the incident. <u>Goodman</u>, 718 F.3d at 1334 (finding the dereliction of duty to be disturbing, but affirming the district court's granting of defendants' summary judgment motion based on Eighth Amendment law). The Eleventh Circuit has stated:

> Our cases are clear that to survive summary judgment on a deliberate indifference claim, the plaintiff must present some evidence of prison officials' subjective awareness of a substantial risk of serious harm to the inmate. <u>See, e.g.</u>, <u>McElligott v. Foley</u>, 182 F.3d 1248, 1255 (11th Cir.1999) (explaining that "a finding of deliberate indifference requires a finding of the defendant's subjective awareness of the relevant risk" (internal quotation marks omitted)). [Plaintiff] has adduced no evidence that either [Defendant] was subjectively aware of the peril to which [Plaintiff] was exposed on the night in question, and that failure is fatal to his claim.

<u>Goodman</u>, 718 F.3d at 1333-34. Given Frederick's failure to provide any evidence that Tompkins was deliberately indifferent to a substantial risk of serious harm to Frederick, no reasonable jury could find that Frederick suffered a violation of his Eighth Amendment right under these particular circumstances. <u>See</u> <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."). As such, Defendant's Motion is due to be granted as to Frederick's Eighth

Amendment claim against him, and Frederick's request for summary judgment in his favor is due to be denied.[22]

## B. State Law Claims

Because Defendant Tompkins is entitled to summary judgment as to Frederick's Eighth Amendment claim against him and the Court has no basis to exercise diversity jurisdiction, the Court declines to exercise supplemental jurisdiction over his pendent state claims. See Raney v. Allstate Ins. Co., 370 F.3d 1086, 1088-89 (11th Cir. 2004) (noting that district courts are encouraged "to dismiss any remaining state claims when, as here, the federal claims have been dismissed prior to trial."). Accordingly, counts two, three, four, and five are due to be dismissed without prejudice. See id. Frederick may refile these claims in state court if he wishes to do so.

In consideration of the foregoing, it is now

**ORDERED:**

1.     Defendant Tompkins' Motion for Summary Judgment (Doc. 46) is **GRANTED**.

2.     Plaintiff's request for summary judgment (Doc. 51) is **DENIED**.

---

[22] In light of this conclusion, the Court need not address Tompkins' argument on the issue of qualified immunity.

3.     Plaintiff's Motion to Submit Declarations of Witnesses (Doc. 58) is **DENIED.**

4.     The Court declines to exercise supplemental jurisdiction over the remaining state claims, and therefore, Frederick's claims under counts two, three, four, and five are **DISMISSED WITHOUT PREJUDICE**.

5.     The Clerk shall enter judgment in favor of Defendant Tompkins, correct the docket to reflect the correct spelling of Defendant's surname, terminate any pending motions, and close the case.

**DONE AND ORDERED** at Jacksonville, Florida, this 15th day of June, 2022.

**MARCIA MORALES HOWARD**
United States District Judge

Jax-1 6/15
c:
Derrick D. Frederick, #122803
Counsel of Record

29